United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 05, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 18-36893** |
| **USA PROMLITE TECHNOLOGY INC,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| **USA PROMLITE TECHNOLOGY, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 19-3331** |
| | § | |
| **CITY OF HILDALGO** | § | |
| and | § | |
| **TEXAS ENVIRO-LITE,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Defendant, City of Hidalgo, brings a *Daubert* challenge against USA Promlite Technology, Inc. and American First National Bank's expert witness, Paul Saladino.  On September 1, 2022, this Court held a hearing on the challenge and for the reasons stated below, the Court finds that the City of Hidalgo's *Daubert* challenge is sustained in part and overruled in part.  Excluding any testimony related to his maintenance savings calculations, Paul Saladino will be permitted to testify as to his expert report produced prior to May 16, 2022.

### I.    BACKGROUND

The City of Hidalgo  is a home-rule municipality in the Rio Grande Valley.[1]  In 2013, City of Hidalgo entered into a contract with U.S.A. Promlite Technology, Inc. ("*Promlite*") for the

---

[1] ECF No. 95 at 2, ¶ 3. Pursuant to Texas Local Government Code § 5.004, "[a] municipality is a home-rule municipality if it operates under a municipal charter that has been adopted or amended as authorized by Article XI, Section 5, of the Texas Constitution."

retrofitting and installation of LED lights in all city buildings, streets lamps, parking lots, and the State Farm Arena (now known as the Payne Arena) and other government-owned spaces, (the "*Retrofit*").[2]  Disputes over the Retrofit arose and Promlite sued City of Hidalgo in the 93rd Judicial District Court of Hidalgo County ("*State District Court*") for breach of contract and asserted quasi-contractual equitable claims for unjust enrichment and quantum meruit (*USA Promlite Technology, Inc. vs. City of Hidalgo*, Case No. C-0628-16-B) ("*State Court Action*").[3]

American First National Bank ("*AFNB*" and together with Promlite, "*Plaintiffs*'") filed a Petition in Intervention claiming that it received an assignment from Promlite as to the breach of contract claim against  City of Hidalgo.[4]  This was purportedly part of the loan agreement between AFNB and Promlite.[5]  The State District Court granted summary judgment against AFNB's intervention claim ("*Summary Judgment Order*").[6]  Subsequently, Promlite filed for bankruptcy on December 6, 2018.[7]  Promlite then filed a Notice of Removal of the State Court Action against Defendant[8] and later, AFNB filed a motion for reconsideration of the Summary Judgment Order.[9]

After a hearing, this Court reconsidered the Summary Judgment Order and found that AFNB has standing to proceed in this adversary under its partial assignment of Promlite's breach of contract claim.[10]  In its initial disclosures under Federal Rule of Civil Procedure 26, AFNB disclosed that it retained Paul Saladino ("*Saladino*"), an energy supply analyst and energy market consultant with experience in both electricity and gas markets, as an expert witness.[11]  The

---

[2] *Id.* at 3-4, ¶ 9-16; ECF No. 95-3.
[3] ECF No. 9-8. See also
[4] ECF No. 59 at 3, ¶ 3.
[5] *Id.*
[6] ECF No. 11-12.
[7] Case No. 18-36893.
[8] ECF No. 1.
[9] ECF No. 14.
[10] ECF No. 37.
[11] ECF No. 56.

disclosures also included Saladino's expert report and curriculum vitae.[12]  AFNB intends to have Saladino provide his expert opinion at trial as to the various energy and maintenance savings City of Hidalgo received following Promlite's Retrofit.[13]  On July 6, 2022, "Defendant City of Hidalgo's Motion to Exclude the Expert Testimony of Paul Saladino" was filed.[14]  On July 27, 2022, AFNB filed "AFNB's Response to the City of Hidalgo's Motion to Exclude."[15]  The Court held a hearing on September 1, 2022, ("*Hearing*") and now issues its instant memorandum opinion.

## II.   JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

This Court lacks both arising in and arising under jurisdiction because Plaintiffs' remaining cause of action for breach of contract is neither created or determined by title 11 nor does it arise only in bankruptcy.[16]  Under 28 U.S.C. § 157(a), "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 ...."[17]  For jurisdiction to "arise under" title 11, the cause of action asserted by the plaintiff must be either created or determined by title 11.[18]  "Arising under" jurisdiction requires that the proceeding "invoke a substantive right provided by [the Bankruptcy Code]."[19]  "Arising in" jurisdiction requires that the proceeding "would have no existence outside of the bankruptcy," where the asserted causes of action are not based on any provision of the Bankruptcy Code.[20]

Plaintiffs' remaining cause of action in this case does not arise under or arise in title 11.[21]

---

[12] *Id.*
[13] *Id.*
[14] ECF No. 130.
[15] ECF No. 131.
[16] *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987) (alteration in original).
[17] Emphasis added.
[18] *In re Wood*, 825 F.2d at 96.
[19] *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 267 (5th Cir. 2005).
[20] *In re Wood*, 825 F.2d at 880.
[21] *See, e.g., Apache Corp. v. Castex Offshore, Inc. (In re Castex Energy Partners, LP)*, 584 B.R. 150, 155, 157 (Bankr. S.D. Tex. Feb. 1, 2018) (finding that plaintiff's breach of contract claim and defendant's counter claims were state law claims not brought under title 11) (citing *In re Petroleum Products & Serv., Inc.*, 556 B.R. 296, 302 (Bankr. S.D. Tex. 2016)).

Plaintiffs' claim for breach of contract was initiated in state court[22] and arises under the Texas Business and Commerce Code.[23]   Plaintiffs do not argue that their breach of contract claim is based on substantive rights provided by the Bankruptcy Code and this Court does not find any such rights relevant to this proceeding.   Additionally, this case landed in this Court only because Promlite removed it based on its underlying bankruptcy case.[24]   If not for Promlite's bankruptcy, the claim asserted could have been adjudicated on the merits in the state court.[25]

Nevertheless, this Court has related to jurisdiction over this matter pursuant to 28 U.S.C. § 157(c)(1), which provides "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11."   A proceeding is "related to" a case under title 11 "when the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[26]   In other words, "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."[27]   Here, Promlite is the debtor in the underlying Chapter 7 bankruptcy case.[28]   The outcome of this adversary proceeding could conceivably impact the administration of Promlite's bankruptcy case because if it prevails in the instant suit and is awarded any of the damages it seeks,[29] that money will become property

---

[22] ECF No. 59, Ex. 4.

[23] *See* ECF No. 14-2; *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (recognizing quantum meruit as an equitable remedy adjudicated in Texas courts); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84) (recognizing unjust enrichment as an equitable remedy adjudicated in Texas courts).

[24] *See* ECF No. 1 at 2.

[25] *See In re Castex Energy Partners, LP*, 584 B.R. at 155 (finding that because the suit was originally filed in state court and the breach of contract claim and counterclaims asserted were based on state law, the suit could have proceeded to the merits of the claims in state court.).

[26] *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 569 (5th Cir. 1995) (alteration in original) (citations omitted).

[27] *Id.* (citing *In re Majestic Energy Corp.*, 835 F.2d 87, 90 (5th Cir. 1988)). *See also, e.g.*, *Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir. 2007); *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (holding that "the 'related to' language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simply proceedings involving the property of the debtor or the estate.").

[28] Case No. 18-36893.

[29] Case No. 19-3331, ECF No. 95.

of the estate pursuant to 11 U.S.C. § 541(a) and be subject to the $1,817,377.73 in liabilities Prom-lite disclosed on its latest schedules.[30]  Any money potentially won in a lawsuit such as this one conceivably would have an effect on administration of the bankruptcy estate.[31]  As such, the Court holds jurisdiction pursuant to 28 U.S.C. § 1334(b) and now exercises its jurisdiction in accordance with Southern District of Texas General Order 2012-6.[32]

Furthermore, this Court may only hear a case in which venue is proper.[33]  28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."  Debtor had its principal place of business in Sugar Land, Texas[34] and therefore, venue of this proceeding is proper.

This Court must evaluate whether it has constitutional authority to enter a final judgment in this case.  In *Stern v. Marshall,* the Supreme Court held that whether a bankruptcy court can enter a final judgment in a case depends on whether the cause of action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.[35] This adversary proceed-ing involves a state law cause of action for breach of contract between the debtor and two non-debtor parties and would not necessarily be resolved in the claims allowance process.  Absent consent, bankruptcy judges may only issue reports and recommendations for non-core proceed-ings.[36]  Here, the City Hidalgo filed a notice of non-consent to entries of final orders on non-core

---

[30] Case No. 18-36893, ECF No. 48 at 16. In its schedules, Promlite discloses that its only assets are $1,000 in cash, this cause of action, and a cause of action for an unknown amount against Edinburg Consolidated Independent School District.
[31] *See Beitel v. OCA, Inc. (In re OCA, Inc.)*, 551 F.3d 359, 367 (5th Cir. 2008) (finding that the adversary proceeding could have an effect on the bankruptcy estate because a judgment against the defendant would increase the estate).
[32] *In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).
[33] 28 U.S.C. § 1408.
[34] Case No. 18-36893, ECF No. 1.
[35] 564 U.S. 462 (2011).
[36] *See* 28 U.S.C. §§ 157(b)(1), (c)(1); *see also Stern*, 564 U.S. at 480.

matters by this Court.[37] However, a court may still issue interlocutory orders in proceedings where

the court lacks authority to issue a final judgment.[38] An order resolving fewer than all of the claims

presented in a complaint is interlocutory.[39] Resolving a *Daubert* challenge results in an interloc-

utory order because no causes of action are resolved in ruling on a *Daubert* challenge.

Accordingly, the order accompanying this opinion is interlocutory and may be entered

without a determination of the Court's constitutional authority to enter a final judgment.[40]

### III.   ANALYSIS

#### A.  *Daubert*/Federal Rules of Evidence 702 and 703

City of Hidalgo argues that Saladino's expert testimony should be excluded under *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[41] Federal Rule of Evidence

702 serves as the proper standard for determining the admissibility of expert testimony.[42] Federal

Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise, if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help
>>     the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the
>>     case.[43]

In *Daubert*, the Supreme Court set forth five factors courts should consider when exercis-

ing their gate-keeping function under Federal Rule of Evidence 702 and making their preliminary

assessments of whether the reasoning underlying expert testimony is scientifically valid and can

---

[37] ECF No. 35.
[38] *Sommers v. Anixter, Inc. (In re Trailhead Eng'g LLC*, No. 18-32414, 2020 Bankr. LEXIS 3547, at *6 (Bankr. S.D. Tex. Dec. 21, 2020) (citation omitted).
[39] *Id.*
[40] *Id.*
[41] *See* ECF No. 130.
[42] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[42]
[43] Fed. R. Evid. 702.

properly be applied to the facts in issue.[44]  The five factors are: (1) whether the technique in question has been tested; (2) whether the technique has been subject to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community.[45]  "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[46]  The ultimate inquiry is whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact.[47]  The answer to that inquiry determines whether the testimony is admissible at trial.[48]  *Daubert* applies equally to experts that rely on the application of scientific principles and those that rely on skill- or experience-based observation.[49]

A court is not to weigh expert testimony under *Daubert*.[50]  Instead, the court's role is to ensure that evidence in dispute is at least sufficiently reliable and relevant to the issue before the fact finder and appropriate for consideration.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence."[51]  The Court's gatekeeping role is not a substitute for the adversarial process.[52]

---

[44] *Daubert*, 509 U.S. 579, 592–93 (1993).

[45] *Id.* at 593–94.

[46] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).

[47] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[48] *See id.*

[49] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

[50] *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying expert's testimony.").

[51] *Daubert*, 509 U.S. at 596.

[52] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

*Daubert* and its principles apply to all expert testimony, not just "scientific" testimony.[53]  The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible and reliable,[54] **but need not satisfy each** *Daubert* **factor.**[55]  *Daubert* directs that the trial court determine admissibility under **Rule 702** by following the directions provided in **Rule 104(a)**.[56]  When making its determination under **Rule 104(a)**, "the court is not bound by evidence rules, except those on privilege."[57] Experts need not be highly qualified to testify, and differences in expertise go to the weight of the testimony, rather than admissibility.[58]  Nonetheless, courts need not admit testimony that is based purely on the *ipse dixit*[59] of the expert.[60]  Further, even if the expert is qualified, the basis of his opinion must be reliable and the underlying methodology must have been correctly applied to the case's particular facts in order for his testimony to be relevant.[61]  "In short, expert testimony is admissible only if it is both relevant and reliable."[62] Expert witnesses may base opinions on facts or data that the expert "has been made aware of or personally observed."[63]  If the facts and data relied on are the sorts that experts in that field would reasonably rely on, then those facts "need not be admissible for the opinion to be admitted."[64]  Accordingly, experts may base their opinions on otherwise-inadmissible information, such as hearsay, so long as the information is the sort reasonably relied on in the expert's field.[65]

---

[53] *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, (1999).

[54] *See* FED. R. EVID. 104(a); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir.1998).

[55] *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004).

[56] *Daubert,* 509 U.S. at 592.

[57] FED. R. EVID. 104(a).

[58] *Huss v. Gayden,* 571 F.3d 442, 452 (5th Cir. 2009).

[59] *See* Merriam Webster's Dictionary for reference, defining *ipse dixit* as "an assertion made but not proved".

[60] *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146,  (1997).

[61] *Daubert,* 509 U.S. at 593; *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 352 (5th Cir.2007).

[62] *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 243–44 (5th Cir.2002).

[63] FED. R. EVID. 703.

[64] *Id.*

[65] *Factory Mut. Ins. Co. v. Alon USA L.P.,* 705 F.3d 518, 524 (5th Cir.2013).

Expert witnesses may base opinions on facts or data that the expert "has been made aware of or personally observed."[66] If the facts and data relied on are the sorts that experts in that field would reasonably rely on, then those facts "need not be admissible for the opinion to be admitted."[67] Accordingly, experts may base their opinions on otherwise-inadmissible information, such as hearsay, so long as the information is the sort reasonably relied on in the expert's field.[68]

The purpose of Rule 703 is largely practical—experts generally base their opinions on information which, to be admissible in court, would entail "the expenditure of substantial time in producing and examining various authenticating witnesses."[69] "Because experts may use their past experience and professional judgment to make critical decisions on the basis of such information outside of court, Rule 703 was intended 'to bring the judicial practice into line with the practice of the experts themselves when not in court.'"[70] Courts nevertheless must serve a gatekeeping function with respect to Rule 703 opinions to ensure "the expert isn't being used as a vehicle for circumventing the rules of evidence."[71] "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'"[72]

As stated, the party putting forth the expert testimony has the burden of showing that the testimony is reliable, but "need not satisfy each *Daubert* factor."[73] City of Hidalgo asserts five separate basis to exclude Saladino's testimony, to wit: (1) Saladino is not qualified to testify as to

---

[66] FED.R.EVID. 703.

[67] *Id.*

[68] *Factory Mut. Ins. Co. v. Alon USA L.P.,* 705 F.3d 518, 524 (5th Cir.2013).

[69] *Id.* (quoting FED.R.EVID. 703, advisory committee's note).

[70] *Id.* at 524 (quoting FED.R.EVID. 703, advisory committee's note).

[71] *Id.* (quoting *In re James Wilson Assocs.,* 965 F.2d 160, 173 (7th Cir.1992)).

[72] *Id.* (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 387 F.Supp.2d 794, 808 (N.D.Ill.2005)). The rule "was never intended to allow oblique evasions of the hearsay rule." *Id.* (quoting *Loeffel,* 387 F.Supp.2d at 808).

[73] *United States v. Hicks,* 389 F.3d 514, 525 (5th Cir. 2004).

maintenance savings; (2) Saladino's opinion testimony as to yearly energy savings and transportation distribution service provider charges savings from 2014-2021 is unreliable; (3) Saladino's testimony is irrelevant and unreliable considering Texas Local Government Code § 271.153; (4) there is no legal or factual basis for Saladino's opinion; and (5) Saladino's reports and calculations produced after May 16, 2022 should be excluded. The Court will consider each in turn.

## B. The City of Hidalgo's *Daubert* Challenges

### 1. Saladino's testimony as to maintenance savings

City of Hidalgo first complains that Saladino is not qualified to testify as to maintenance savings because Saladino repeatedly admitted during his deposition that maintenance savings are outside his area of expertise.[74] Saladino's expert report includes a section dedicated to estimated maintenance savings where Saladino explains the methodology used in determining maintenance savings to the City of Hidalgo.[75] Saladino concludes that there was an estimated maintenance savings of $64,988.51 each year.[76]

Rule 702 requires a witness to be qualified as an expert by knowledge, skill, experience, training, or education. "Emphasis on qualifications over reliability," however, "reflects a pre-*Daubert* sensibility."[77] "A completely unqualified expert using the most reliable of tests should not be allowed to testify. But the heart of *Daubert* is relevance and reliability."[78] If "some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function."[79] Then, "qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity."[80]

---

[74] ECF No. 130 at 5.
[75] ECF No. 131-5 at 7–8.
[76] *Id.* at 8.
[77] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997).
[78] *Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 507 (5th Cir. 1999).
[79] *Id.*
[80] *Id.*

Nevertheless, at the Hearing, AFNB conceded that Saladino is not an expert as it relates to the maintenance savings, and that the information necessary to assess the City of Hidalgo's maintenance savings was never given to Saladino.[81]  This is corroborated by the fact that Saladino routinely testified at his deposition that the maintenance savings were outside his area of expertise.[82]  As such, Saladino's opinion as it relates to maintenance savings is unreliable and inadmissible.

Accordingly, City of Hidalgo's *Daubert* challenge that Saladino is not qualified to testify as to maintenance savings is sustained.  Saladino's testimony and expert report as they pertain to maintenance savings for City of Hidalgo are excluded.

### 2.   Whether Saladino's opinion testimony as to yearly energy savings and transportation distribution service provider charges savings from 2014-2021 is reliable

City of Hidalgo asks this Court to exclude Saladino's opinion on yearly energy savings and transportation distribution service provider ("*TDSP*") charges savings from 2014–2021 alleging that it is unreliable.[83]  City of Hidalgo asserts that the energy savings estimate is unreliable because Saladino stated during his deposition that a baseline number is critical to determining energy savings and Saladino was unable to verify the baseline number provided to him by Promlite.[84]  However, City of Hidalgo selectively chose the portions of Saladino's deposition testimony that suited its position.  The following exchange also occurred:

Q. Okay.  So you are relying on Promlite's baseline number, correct?

A. Well, no, I had some overall bill copies that matched those numbers.  Right.  So, I'm not relying on Promlite's.  I'm just saying that I can't dig down and verify this includes every meter like I would like to.  So, I would like to do extra layers of verification.  But I was just unable to do that.  I still didn't just trust their number.  I made sure it matched what was on the bill.  And if somebody signed a contract saying this is your baseline usage that we're going to calculate this dollars savings on, I assumed it was agreed by all parties.  I mean, you know, since the installation occurred, I imagine that that was agreed to if that's the basis for calculating savings

---

[81] *See* September 1, 2022, Min. Entry at 9:34.
[82] *See* ECF No. 130 at 5-6.
[83] ECF No. 130 at 8.
[84] *Id.* at 8–9.

by both parties, not just Promlite's calculation. But as I say there, I did what I could with what I had but, yes, it was not ideal in the sense that I would have liked to make sure every single meter that we know is included in this deal was also there, for instance. But, no, I didn't have that.

Q. Okay. And so - - so, the lack of this information and no way to access their meter level data, that is something that would be critical to this analysis, right?

A. No.

Q. That's what you - - that's what you say here in your report.

A. It would be critical to verify the baseline for myself like - -

Q. And that's - - that's my point, sir, is you were unable to verify the baseline for yourself because you're missing this critical information?

A. That's right.[85]

Thus, although Saladino admits that he was unable to verify the baseline number provided by

Promlite because he didn't have access to meter level data, he also states that he did not just rely

on Promlite's number. Rather, he used bills available to him to check the numbers provided.

Furthermore, Saladino calculated his own baseline number which differs from that of

Promlite's. Saladino explained his energy savings calculations this way:

9. Energy savings is the most obvious form of savings with any project of this kind. The methodology for calculating these savings is straightforward. All that needs to be done is to compare pre-installation usage to post-installation usage to see how usage has changed due to the installation with adjustments being made for weather variance from normal and any material changes. This difference in volume is then multiplied by the contracted $/kWh rate of the City of Hidalgo.

10. The only consideration in this calculation was which data would best reflect the numbers. For Pre-Installation usage, I used the 12 previous months prior to the installation just as had been done in the audit Promlite prepared and that City of Hidalgo[86] signed off on before the contract was agreed to and the installation had occurred. I was able to verify these usage volumes with bill copies, for the most part, although many of the bills prior to 2014 are missing. Furthermore, all bills from Suez, the REP serving City of Hidalgo, prior to installation are summary bills only. This means that they list a usage charge and TDSP charge and total usage, but there is no evidence of which meters are on the account and no way to access the

---

[85] ECF No. 130-3 at 110:7–111:15.
[86] At the Hearing, counsel for City of Hidalgo asserted that best practices in the industry were to use three years of bills to establish a proper baseline. *See* September 1, 2022, Min. Entry at 9:17. However, City of Hidalgo failed to elaborate or offer any evidence in support of this assertion, so the Court will disregard it.

meter level data critical to this analysis, therefore I had little choice in my method-
ology for pre-installation usage.

. . .

20. As reflected above, I establish pre-installation baseline usage for City of Hi-
dalgo. Promlite's baseline for all usage was 10,261,554 kWh/yr. My analysis base-
line was 10,167,641 kWh/yr. My lower baseline reduced the overall savings calcu-
lated and favors City of Hidalgo compared to Promlite's baseline. My determina-
tion of baseline values was also done prior to seeing anything other than the actual
usage reads provided.[87]

According to Saladino's sworn affidavit, he calculated the pre-installation usage—the baseline—

based on the bills provided by City of Hidalgo, which resulted in a slightly lower baseline number

than Promlite's. Thus, although Saladino was unable to verify Promlite's baseline number based

on meter level data, Saladino calculated his own baseline number and used that number in his

analysis.

City of Hidalgo further asserts that the calculated savings is unreliable because neither

Saladino nor Promlite could determine how much of City of Hidalgo's energy usage or TDSP

charges came from lighting only.[88] AFNB counters that City of Hidalgo's argument ignores the

reality that electric meters record total energy usage.[89] AFNB notes that the contract itself ac-

counted for this reality by requiring City of Hidalgo to report "any change in or to the [p]remises,

whether structural, operational or otherwise in nature which reasonably could be expected, to in-

crease or decrease the annual energy consumption . . . by at least five percent (5%)."[90] AFNB

asserts that City of Hidalgo never reported any material change that was expected to increase or

decrease the annual energy consumption.[91] As an additional check on consumption, Saladino

looked at City of Hidalgo's individual meters' usage after the lighting retrofit for any change in

---

[87] ECF No. 131-3 at 3, 6 ¶¶ 9–10, 20.
[88] ECF No. 130 at 10.
[89] ECF No. 131 at 7.
[90] ECF No. 131-2 at 26–27, §§ 14.1–14.3.
[91] ECF No. 131 at 7 (citing ECF No. 131-3 at 4–5, ¶ 16).

usage of 50,000 kwh/yr. or greater, which would indicate a structural, operational, or otherwise in nature change that reasonably could be expected to increase or decrease the annual energy consumption by at least 5%.[92]

"The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief."[93]  The Supreme Court has not set forth a specific degree of reliability required or the manner in which trial courts must determine reliability of expert testimony.[94]  The test for determining reliability is adaptable to the particular circumstances underlying the testimony at issue.[95]  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [fact finder's] consideration."[96]

Here, Saladino details the methodology used in calculating energy savings, which requires a comparison of pre-installation usage with post-installation usage.[97]  Saladino explained that he derived the pre-installation from energy bills and stated which bills were missing.[98]  Saladino described how he calculated post-installation usage, the anomalies found in the data from conducting individual meter audits, how he controlled for those anomalies, and explained the adjustments he made to control for factors such as reduced usage caused by COVID-19 and weather.[99]  Once Saladino determined the number of kilowatt hours saved, he multiplied that number by the contract

---

[92] *Id.*
[93] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[94] *See Kumho*, 526 U.S. at 152.
[95] *Id.* at 150–51.
[96] *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985)).
[97] ECF No. 131-3.
[98] *Id.*
[99] *Id.*

energy rate to obtain a dollar amount.[100]  Saladino separately calculated the TDSP charges by comparing pre-installation TDSP charges and post-installation TDSP charges.[101]

Saladino put forth a mathematical method with a thorough explanation of how his final number was derived such that his calculation could be recreated.  Saladino's affidavit also stated that he utilized well established methodologies within the electricity industry for adjusting for weather or any material changes unrelated to the object of the energy efficiency installation.[102] Given the information provided, the Court finds that Saladino's opinion is more than unsupported speculation or subjective belief.  Any discrepancies regarding what portion of the energy savings can be attributed only to lighting is a matter best left to the adversarial process as it ultimately goes to the weight of the evidence and not its admissibility.  Thus, Saladino's opinion carries a sufficient indicia of reliability and is admissible.

Accordingly, City of Hidalgo's *Daubert* challenge to the reliability of Saladino's opinion as to yearly energy savings and TDSP charges is overruled.  Saladino will be permitted to provide his opinion testimony as to yearly energy savings and transportation distribution service provider charges savings from 2014-2021.

### 3.  Whether Saladino's testimony is relevant and addresses recoverable damages considering Texas Local Government Code § 271.153

The City of Hidalgo asserts two arguments as to why Saladino's testimony should be excluded under Texas Local Government Code ("*TLGC*") § 271.153, to wit: (a) § 271.153(c) of the TLGC only provides for actual damages under limited circumstances inapplicable to Promlite's breach of contract claim;[103] and (b) Saladino's expert testimony is irrelevant because it was not

---

[100] *Id.*
[101] *Id.*
[102] ECF No. 131-3 at 4–5, ¶ 16.
[103] *See* September 1, 2022, Min. Entry at 9:26-28.

calculated on a year to year basis, and therefor is not evidence of what is "due and owed" under § 271.153(a)(1).[104]  The Court will take each in turn.

### a. Whether Saladino's testimony should be excluded under § 271.153(c).

At the Hearing, City of Hidalgo asserted that Promlite has no legal basis to seek actual damages under the Retrofit because § 271.153(c) of the TLGC states, "[a]ctual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by § 271.151(2)(B)."[105]  Section 271.151(2) in turn provides:

> (2) "Contract subject to this subchapter" means:
> (A) a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity; or
> (B) a written contract, including a right of first refusal, regarding the sale or delivery of not less than 1,000 acre-feet of reclaimed water by a local governmental entity intended for industrial use.[106]

City of Hidalgo contends that unless the contract pertains to the sale or delivery of reclaimed water intended for industrial use as defined in § 271.151(2)(B), that actual damages are not recoverable against a city government in the state of Texas.  This interpretation, of course, entirely ignores the alternative definition of "contract subject to this subchapter" in § 271.151(2)(A), to which most contracts, including Promlite's, falls into.

Section 271.153(a)(1) clearly provides that, "(a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to… the balance due and owed…"[107]  Clearly, actual damages are recoverable against city governments under contracts other than those

---

[104] *See* ECF No. 130 at 12-15.
[105] Tex. Loc. Gov't Code Ann. § 271.153(c).
[106] Tex. Loc. Gov't Code Ann. § 271.151(2).
[107] Tex. Loc. Gov't Code Ann. § 271.153.

defined in § 271.151(2)(B), and § 271.153(c) merely provides additional remedies, such as specific performance, if the contract relates to subject matter in § 271.151(2)(B).

Accordingly, City of Hidalgo's *Daubert* challenge to Saladino's testimony regarding estimated energy savings because it is irrelevant and does not address recoverable damages under TLGC § 271.153(c) is without merit and is overruled.

### b. Whether Saladino's testimony should be excluded because it is not evidence of what is due and owed under § 271.153(a)(1).

In its brief, City of Hidalgo challenges the reliability and relevancy of Saladino's opinion on the basis that he calculated a seven-year average savings instead of a year-by-year savings for a period of seven years as required by the contract.[108]  City of Hidalgo  argues that under TLGC § 271.153(a)(1) and Texas case law, damages must be calculated according to the terms of the contract and because Saladino did not do so, his damages estimate is irrelevant.[109]  In rebuttal, AFNB asserts that the damages "due and owed" as required by § 271.153(a)(1) is simply the amount of damages for breach of contract.[110]

Section 271.153, in relevant part, states:

(a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

    (1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

    (2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;

    (3) reasonable and necessary attorney's fees that are equitable and just; and

---

[108] ECF No. 130.

[109] *Id.* (citing *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 207, 209 (Tex. App.—Fort Worth 2004, pet. denied)).

[110] ECF No. 131 (citing *Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*, 449 S.W.3d 98, 111 (Tex. 2014)).

interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

The parties disagree about the interpretation of subsection (a)(1), "the balance *due and owed* by the local governmental entity *under the contract* . . . ."[111]

City of Hidalgo cites to *Atlas Copco Tools, Inc.* in support of its position.[112]  In *Atlas*, a September 1, 2000 agreement between the parties provided that the one-year agreement would renew automatically for additional one-year terms, unless either party provided forty-five days prior written notice.[113]  The agreement also allowed either party to terminate the agreement without cause upon sixty days written notice.[114]  One party sent the other sixty days written notice terminating the agreement effective October 15, 2001.[115]  At trial, a damages expert testified as to lost profits calculated for a six-year period or through 2006.[116]  On appeal, the Texas appellate court found that the expert's projections were no more than wishful because the expert ignored the terms of the agreement when measuring lost profits over a six-year period.[117]  The court said that the expert's speculation that the contract would have perpetually renewed over a six-year period was at odds with the terms of the agreement and evidence in the record where the agreement terminated on October 15, 2001, pursuant to the sixty-day notice termination clause.[118]  Because of that, and because the expert ignored the facts of the case and Texas law, the court found that the lost profits were not proven by competent evidence with reasonable certainty.[119]

---

[111] TEX. LOC. GOV'T CODE § 271.153(a)(1) (emphasis added).
[112] ECF No. 130 at 13.
[113] *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 208 (Tex. App.-Fort Worth 2004, pet. denied).
[114] *Id.* at 207.
[115] *Id.*
[116] *Id.*
[117] *Id.* at 208.
[118] *Id.*
[119] *Id.* at 209.

*Atlas* makes no mention of TLGC § 271.153, nor does it involve a government entity. Nevertheless, the Court takes City of Hidalgo's point to be that damages must be calculated according to the terms of the agreement and because the contract at issue in this case provided for savings year-over-year for seven years, calculating an average over seven years necessarily ignores the terms of the contract. Saladino admits that he did not calculate year-over-year savings. Saladino stated that "my expert report is on actualized savings, not projected savings or nothing to do with the contract. So I didn't even have those terms when doing this analysis beyond, again, what was in here . . . ."[120] Unlike in *Atlas*, however, Saladino calculated the average savings over a seven-year period, which is the "benefit sharing period" contemplated by the Retrofit.[121] The *Atlas* court's issue with the expert's damages calculations was that it extended years beyond the end date of the contract. No party in the case at bar disputes that the Retrofit benefit sharing period here was seven years.

AFNB, citing to cases interpreting § 271.153, asserts that the testimony is relevant because it calculates the total damages from a breach of contract. AFNB's assertion hinges on language from the Texas Supreme Court in *Zachry Construction Corporation* that "[s]ection 271.153(a)(1) does not require the 'balance due and owed . . . under the contract' to be ascertainable from the contract."[122] And that "[d]irect damages for breach—'the necessary and usual result of the defendant's wrongful act'—certainly qualify."[123]

In *Zachry Construction Corporation*, the Texas Supreme Court was interpreting § 271.153 to determine which types of damages were permitted by the statute.[124] The court concluded that

---

[120] ECF No. 130-3 at 118:3–11.
[121] ECF No. 131-2 at §§ 1, 3.2.
[122] 449 S.W.3d at 98, 111 (Tex. 2014).
[123] *Id.*
[124] *Id.* at 111–12.

"[r]ead together, Subsections (a)(1) and (b) allow recovery of contract damages, including delay damages, but excluding other consequential damages.  Nothing in the rest of § 271.153 suggests that recoverable damages must be stated in the contract."[125]  *Zachry Construction Corporation* does not stand for the proposition that direct damages for breach may be calculated irrespective of a contract provision dictating how they are to be calculated.

Thus, the Court must still consider whether a seven-year average damages calculation rather than a year-over-year calculation for seven years ignores the terms of the agreement in contravention of § 271.153.  The plain language of § 271.153 limits the amount of money awarded against a local government entity for breach of contract to "the balance due and owed by the local governmental entity under the contract as it may have been amended."[126]  "The word 'due' simply means 'owing or payable' and 'owing' means 'unpaid.'"[127]  In his deposition testimony, Saladino said that the year-by-year savings versus the seven-year average savings would be different but "very close" and that Saladino would need missing bills from City of Hidalgo to determine the year-by-year savings.[128]  Given that Saladino worked with the bills that were produced by City of Hidalgo and made an estimate of the savings, the Court finds Saladino's opinion sufficiently relevant and reliable.  The adversary process is available to City of Hidalgo to attack Saladino's damages calculation at trial.

Accordingly, the City of Hidalgo's *Daubert* challenge on the basis that Saladino's damages estimate is irrelevant because it is not evidence of what is due and owed under TLGC § 271.153(a)(1) is overruled.

---

[125] *Id.* at 112.
[126] Tex. Loc. Gov't Code § 271.153(a)(1).
[127] *Zachry Construction Corporation*, 449 S.W.3d at 111.
[128] ECF No. 130-3 at 120:3–21.

**4. Whether there is a legal or factual basis for Saladino's opinion on the savings calculations in the lighting audit report**

City of Hidalgo next sets forth a laundry list of challenges to the factual and legal basis for Saladino's opinion that "Promlite used best practices while performing their '[l]ighting [a]udit [r]eport' to project estimated savings", to wit:[129] (a) Saladino opines that Promlite and not Enviro-Lite Solutions, LLC ("*Enviro-Lite*") performed the lighting audit report ("*LAR*") without providing any factual basis for that statement; (b) Saladino cannot verify that Promlite was qualified in 2013 to prepare a LAR; (c) Saladino admitted that an audit of all the lighting fixtures is not his expertise; (d) Saladino was not able to independently verify the guaranteed savings in the LAR and so he used Promlite's baseline numbers.[130]  The Court will consider each in turn.

**a. Whether Saladino's testimony should be excluded because he opined that Promlite and not Enviro-Lite performed the LAR without providing a factual basis for this statement**

The City of Hidalgo's first challenge is that Saladino opines that Promlite and not Enviro-Lite performed the LAR without providing any factual basis for that statement, and as such, it lacks foundation, is unreliable, and should be excluded.[131]

In support of his first opinion, Saladino's report states:

- An audit of existing lightbulbs, fixtures, and ballasts was performed; care was taken to ensure bulb wattages and hours of use per day estimates were accurate

- Historical usage was obtained and the lighting costs were checked against historical usage to make sure they were reasonable

- The methodology behind the savings calculations were all done correctly from both a logical and mathematical standpoint[132]

---

[129] ECF No. 131-5.
[130] ECF No. 130 at 15-17.
[131] ECF No. 131 at 15.
[132] ECF No. 131-5.

In support of its challenge, City of Hidalgo cites to *Munoz* where the Fifth Circuit found that one of several problems with the expert's opinion there was that the expert "relied on the plaintiffs' compilations of data, which [gave] rise to a 'common-sense skepticism' regarding the expert's evaluation and did not seek to verify the information presented to him."[133]  In coming to the conclusion that the district court did not commit an abuse of discretion in excluding the expert's testimony and reports, the *Munoz* Court stated that "[t]aken cumulatively, the problems with [the] expert evidence indicate that his expert testimony could be unreliable."[134]

City of Hidalgo's first challenge is inconsequential to the reliability of Saladino's analysis. The LAR states that it was prepared by Promlite and Enviro-Lite.[135]  The crux of Saladino's first opinion is whether best practices were used in preparing the LAR to project estimated savings. Who employed the practices has no effect on whether the "best" practices were indeed utilized. Thus, whether Saladino knew or verified that Promlite, Enviro-Lite, or a third party prepared the report, that information does not go to the admissibility of his testimony or his expert report, but rather goes to the weight assigned by the finder of fact.

Accordingly, City of Hidalgo's *Daubert* challenge that Saladino opines that Promlite and not Enviro-Lite prepared the LAR without providing a factual basis is overruled.

**b. Whether Saladino's testimony should be excluded because he cannot verify that Promlite was qualified in 2013 to prepare a LAR**

City of Hidalgo's second challenge is that Saladino's testimony as to the LAR should be excluded because he cannot verify that Promlite was qualified in 2013 to prepare a LAR.  Saladino provided deposition testimony that in developing his first opinion, he operated from the standpoint that the preparer of the LAR was not qualified and that the right steps were not taken in performing

---

[133] 200 F.3d 291, 301–02 (5th Cir. 2000).
[134] *Id.* at 302.
[135] ECF No. 131-2.

the audit.[136]  Saladino said, "that's what I'm stating in Opinion 1, is that I looked at everything and made that determination without assumption."[137]   Saladino's failure or inability to determine whether Promlite was qualified in 2013 to prepare the LAR does not affect the reliability of his opinion because reliability is based, in large part, on whether the opinion rests on unsupported speculation or subjective belief.[138]  By operating from the standpoint that Promlite was not qualified and did not take the right steps, Saladino's opinion is more objective than if Saladino assumed or verified that Promlite was qualified or took the proper steps.

Accordingly, City of Hidalgo's *Daubert* challenge that Saladino's testimony as to the LAR should be excluded because he cannot verify that Promlite was qualified in 2013 to prepare a LAR is overruled.

### c.  Whether Saladino's testimony should be excluded because he admitted that an audit of all the lighting fixtures is not his expertise

City of Hidalgo's third challenge rests on Saladino's admission that his expertise is not in the physical audit of light bulbs.[139]  In his deposition testimony, Saladino stated that in checking the methodology used by Promlite in preparing the LAR, the only source he had for the number of bulbs involved was the LAR itself, but that the relied on photographs of bulbs taken during the physical audit of the lights to verify that an inventory was actually taken.[140]  Saladino's lack of expertise in the physical audit of light bulbs, however, does not impact his ability to evaluate the mathematical process employed by Promlite or to cross-check the data contained in the LAR with the energy bills produced by City of Hidalgo.

---

[136] ECF No. 130 at 46:18–49:19.
[137] *Id.* at 48:2–4.
[138] *Johnson*, 685 F.3d at 459.
[139] ECF No. 130-3 at 13:23–14:4.
[140] *Id.* at 44:14–24.

Accordingly, City of Hidalgo's *Daubert* challenge that Saladino's testimony should be excluded because he admitted that an audit of all the lighting fixtures is not his expertise is overruled.

**d. Whether Saladino's testimony should be excluded because he was not able to independently verify the guaranteed savings in the LAR and so he used Promlite's baseline numbers**

City of Hidalgo's final challenge rests on Saladino's inability to independently verify Promlite's baseline numbers. As previously stated, Saladino used bill copies to verify the numbers used by Promlite but was not able to verify every meter was included as he would have preferred.[141] Nevertheless, Saladino also calculated his own baseline which differed only slightly from that of Promlite's and Saladino was able to evaluate the mathematical process employed by Promlite to determine whether in compiling the LAR Promlite used "best practices." Thus, although Saladino's analysis involved data compiled by Promlite, he also took measures to verify the data provided to him with bills produced by City of Hidalgo.[142] The bases and sources of Saladino's opinion go to the weight of the opinion rather than its admissibility.[143]

Accordingly, City of Hidalgo's *Daubert* challenge that Saladino's testimony should be excluded because he was not able to independently verify the guaranteed savings in the LAR and so he used Promlite's baseline numbers is overruled.

Additionally, City of Hidalgo's *Daubert* challenge that Saladino provides no factual or legal basis for his opinion on the savings calculations in the LAR is overruled.

**5. Whether Saladino's reports and calculations produced after May 16, 2022 should be excluded**

City of Hidalgo seeks to exclude Saladino's supplemental expert reports that were produced on June 4, 2022, and June 5, 2022, because they were produced after the expert report

---

[141] *Id.* at 110:7–111:15.
[142] *Cf. Munoz*, 200 F.3d at 301–02.
[143] *Viterbo*, 826 F.2d at 422.

deadline of May 16, 2022 established by this Court.[144]  In response, AFNB points to Rules 26(e)(1)(A)-(B) in asserting that Saladino was under an obligation to supplement his report because he learned that his report was incomplete or incorrect and the corrective information was not known to City of Hidalgo.[145]

Pursuant to Rules 26(e)(1)(A) and (e)(1)(B), an expert required to file a report under Rule 26(a)(2)(B) must supplement incorrect or incomplete information included in the report by the time the party's pretrial disclosures under Rule 26(a)(3) are due.  Rule 26(a)(3)(B) provides that "[u]nless the court orders otherwise, these disclosures must be made at least 30 days before trial." On April 25, 2022, this Court entered an "Amended Comprehensive Scheduling, Pre-Trial and Trial Order" ordering that "American First National Bank must supplement its expert report not later than May 16, 2022."[146]  Thus, this Court ordered a different disclosure date than that provided in Rule 26(a)(3), as permitted by that Rule.  Promlite and AFNB were to comply with that order.

Accordingly, any supplemental report produced by Saladino after May 16, 2022 is excluded.

## IV.   CONCLUSION

An order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.


SIGNED October 5, 2022


_____
Eduardo Rodríguez
United States Bankruptcy Judge

---

[144] ECF No. 130.
[145] ECF No. 131.
[146] ECF No. 128.